Weinberg, Gross & Pergament LLP
*Attorneys for Eighth Avenue Sky, LLC*
400 Garden City Plaza, Suite 403
Garden City, New York 11530
Office: (516) 877-2424
Cell: (516) 225-6008
Marc J. Weingard

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X

In Re:                                          Chapter 7

Himanshu Patel and Manisha Patel,              Case No.: 20-11374-scc

      Debtor.

---------------------------------------------------------X

Eighth Avenue Sky, LLC,                        Adv. Pro. No.:

      Plaintiff,

    v.                                        COMPLAINT TO DENY
                                               DISCHARGE PURSUANT TO
Himanshu Patel and Manisha Patel,              <u>11 U.S.C. §§ 523(a) and 727(a)</u>

      Defendants.

---------------------------------------------------------X

## <u>PRELIMINARY STATEMENT</u>

      Eighth Avenue Sky, LLC, by its attorneys, Weinberg, Gross & Pergament LLP, as and for its Complaint herein, respectfully alleges and represents to this Court, as follows:

## <u>JURISDICTION AND VENUE</u>

      1.    This adversary proceeding is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I) and § 1334.

      2.    This adversary proceeding constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

- 1 -

3.	This Adversary Proceeding has been brought in accordance with Rules 4007 and 7001(4) and (6) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

4.	Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

5.	The statutory predicate for the relief requested herein is 11 U.S.C. §§ 523 and 727.

## PARTIES

6.	Defendants Himanshu ("Himanshu") Patel and Manishal ("Manisha") Patel (collectively "Debtor") are the Debtor in the above-referenced bankruptcy case, which was filed on June 8, 2020 (the "Petition Date").

7.	Plaintiff Eighth Avenue Sky, LLC ("Plaintiff" or "EAS") is a judgment creditor herein by virtue of a judgment docketed on July 8, 2019 against the Debtor in the Office of the New York County Clerk in the sum of $1,256,753.25 ("Judgment") based on the Debtor's breach of a guaranty agreement, dated August 19, 2014 ("Guaranty").

8.	EAS is identified as a creditor in the Petition in the sum of $3,500,000.00.

## OVERVIEW

9.	EAS brings this action to deny the Debtor a discharge and to except its debt from discharge based on numerous grounds, including that the Debtor: (a) furnished EAS with a statement in writing respecting their financial condition that was materially false in numerous respects: (b) filed a Petition and Schedules containing material misrepresentations and falsehoods; (c) provided false and misleading testimony regarding their assets and financial history at their § 341 meeting of creditors and Rule 2004 examination; (d) failed to satisfactorily explain their loss of assets; and (e) failed to keep or preserve documents and records from which their financial condition might be ascertained.

## BACKGROUND

10. On August 21, 2014, EAS, as landlord, entered into a 12-year commercial lease ("Lease") with Metro 765, Inc. ("Metro"), as tenant.

11. Under the Lease, Metro was to operate a Subway restaurant franchise and pizza parlor at 765 Eighth Avenue, New York City, New York ("New York Subway").

12. The Debtor are the principals of Metro.

13. On or about August 19, 2014, each Debtor executed the Guaranty, by which they jointly and severally guaranteed all of Metro's obligations under the Lease.

14. To induce EAS to enter into the Lease and accept their Guaranty, the Debtor provided EAS with a statement of financial condition, dated as of April 30, 2014, and a separate statement setting forth the "Current Value" of the five (5) real properties then owned by the Debtor and the value of the Debtor's "Business Equity in Tennessee," dated April 18, 2014 (collectively "PFS" or "Personal Financial Statement").

A. The PFS.

15. The PFS purports to identify the Debtor's Assets and Liabilities as of April 2014.

16. The PFS classifies the Debtor's Assets under several categories, including: (a) cash on hand and in bank accounts; (b) life insurance policies; (c) personal property; (d) real estate; and (e) business equity/investments.

17. The PFS was prepared by Neovision Consulting Inc., a New Jersey-based CPA firm (the "CPA"), purportedly "in accordance with "Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants."

18.     During his Rule 2004 examination, Himanshu testified that he did not provide any documents to the CPA in connection with the CPA's preparation of the PFS, and that the CPA conducted no investigation and simply inserted the values as dictated by Himanshu.[1]

19.     Upon information and belief, the Debtor caused the PFS to be issued and delivered to EAS with intent to deceive.

20.     The PFS is a statement in writing respecting the Debtor's financial condition within the meaning of 11 U.S.C. § 523(a).

21.     EAS reasonably relied upon the PFS in agreeing to enter into the Lease and in accepting the Debtor's guaranty.

22.     The PFS is materially false and misleading in numerous respects.

23.     In particular, the PFS grossly inflated the value of the Debtor's assets, including automobiles, personal furnishings, real estate and business investments.

24.     In addition, with the exception of HUD-1 closing statements, the Debtor failed to keep or preserve any recorded information regarding the assets listed in the PFS, including with respect to cash in the bank, life insurance policies, automobiles, personal furnishings and business investments.

25.     The Debtor similarly failed to keep or preserve any recorded information regarding their income and expenses from April 2014 to the Petition Date, including but not limited bank statements and credit card statements.

26.     As a result, the Debtor's expenses and spending in the six (6) years leading up to the Petition Date is a blank slate.

---

[1] Unless otherwise indicated, references to the Debtor's testimony are the Debtor's Rule 2004 examination.

i.      Cash.

27.     In the PFS, the Debtor represented that as of April 2014, they had $828,000 in their personal bank accounts, including $400,000 in a joint checking account at Regions Bank, $278,000 in a joint checking account at Bank of America and $150,000 in a joint checking account at Chase Bank.

28.     Himanshu testified that he "could not recall" whether the Debtor actually had the amount of funds on deposit at Regions Bank, Bank of America and Chase Bank represented in the PFS.

29.     The Debtor did not retain any bank statements from Regions Bank, Bank or America or Chase Bank, rendering it impossible for EAS to determine whether the Debtor possessed the amount of cash as represented in the Financial Statement.

30.     Himanshu testified that the Debtor closed their joint checking account at Regions Bank in or about 2012, so either the Debtor misrepresented the status of the Regions Bank account (and the amount on deposit) in the PFS or Himanshu provided false testimony during his 2004 examination concerning the date the account was closed.

31.     Based on information provided by Bank of America and Chase Bank in post-Judgment restraining notices issued by EAS, as of in or about July 2018, the Debtor had $3,867.29 in their account at Bank of America and $367.05 in their account at Chase Bank.

32.     After supplying the Debtor with the PFS, the Debtor opened a joint checking account at TD Bank.

33.     The Debtor did not retain any copies of their TD Bank statements.

34.     Himanshu testified that the Debtor closed their account at TD Bank in 2017 after EAS "put the levy" on that account.

35.     Contrary to Himanshu's testimony, EAS did not issue an information subpoena on TD Bank until 2019, and no funds in the account were restrained by TD Bank.

36.     According to the Petition, the Debtor has no money deposited in any financial institution.

37.     Due to Himanshu's false testimony and his practice of failing to preserve bank statements, EAS cannot ascertain when and how the Debtor spent nearly all of the $828,000 in cash allegedly on hand in their bank accounts as of April 2014.

ii.     Life Insurance Policies.

38.     The Financial Statement lists a "NY Life Insurance" policy ("Policy") with a "Face Value" of $2,000,000 and a "Cash Value" of $280,000.

39.     Himanshu testified that he was the owner of the Policy and that Manisha was the beneficiary of the Policy.

40.     Himanshu testified that after April 2014, the Debtor borrowed against the Policy's death benefit in the amount of its full cash value.

41.     The Debtor did not maintain records reflecting any of the money borrowed against the Policy, such as the account into which the borrowed funds were deposited and the use to which the Debtor put the Borrowed Funds.

42.     The Debtor testified that at some point prior to the Petition Date, they ceased paying the premiums on the Policy, but that the Policy remained in force as of the Petition Date.

43.     The Debtor failed to list the Policy as an asset in their Bankruptcy Schedules.

iii.   Automobiles.

44.    On October 15, 2005, the Debtor filed a personal bankruptcy petition under Chapter 11 of the Bankruptcy Code bankruptcy in the Middle District of Tennessee in December 2005 ("Tennessee Bankruptcy").

45.    In their Tennessee Bankruptcy Schedules, the Debtor listed as assets a 1997 Mercedes E320 with 70,000 miles and a 2002 Dodge Caravan with 50,000 miles (collectively "Automobiles").

46.    In their Tennessee Bankruptcy Schedules, the Debtor valued the Mercedes E320 at $11,000 and the Dodge Caravan at $8,000, for a total value of $19,000.

47.    Nearly a decade later, after having presumably put tens of thousand of additional miles on their Automobiles,[2] in their PFS, the Debtor represented that the "Est. Market Value" of their Automobiles was $60,000.

48.    Despite that automobiles are typically a depreciating asset, as represented by the Debtor in the PFS, the Automobiles increased in value by more than 300% from 2005 to 2014.

49.    The market value of the Automobiles set forth in the Financial Statement was materially overstated.

iv.   Home Furnishings.

50.    The Financial Statement states that the "Est. Market Value" of the Debtor's jewelry, furnishings and personal property is $275,000.

51.    Himanshu testified that with the exception of two (2) rings valued at a total of $150, the $275,000 related to furnishings purchased by the Debtor for their home in Tennessee,

---

[2] The Debtor "could not recall" the mileage on the Automobiles on the date the PFS was prepared.

which they purchased in 1995 and sold in 2015 ("Tennessee Home"), and their apartment located at 140 W. 57th Street in New York City ("Apartment"), which they purchased in 2004 and at which they still reside.

52.     Himanshu testified that the value for furniture set forth in the PFS was his "opinion" of the value, which was based on how he "felt" about the value, not on any sort of appraisal or other reasoned analysis.

53.     Himanshu testified that approximately $200,000 of the nearly $275,000 in furnishings identified in the PFS related to the furnishings located in the Tennessee home.

54.     Shortly after provided EAS with the PFS, the Debtor sold their Tennessee home for $274,900.

55.     With respect to the furniture in the Tennessee home that was allegedly worth $200,000, Himanshu testified that the Debtor "gave it away with the house, free."

56.     The estimated market value of the furnishings set forth in the Financial Statement was materially overstated.

    v.      Real Estate.

57.     In the PFS, the Debtor ascribes a "market value" of $9,689,000 to their real estate holdings ("Real Properties") as follows: (1) Apartment - $3,500,000; (2) Tennessee Home - $389,000; (3) "Commercial Land" at 35 North Road in East Windsor, Connecticut ("North Road Property") - $2,100,000; (4) "Commercial Real Estate" in Nashville, Tennessee ("Strip Shopping Center") - $1,200,000; and (5) "Hotel" in Nashville, Tennessee ("Hotel") - $2,500,000.

58.     As testified to by Himanshu, prior to valuing the Real Properties in the PFS, the Debtor did not secure an appraisal or consult with any real estate broker or appraiser

about any of the Real Properties.

59.     As to testified to by Himanshu, prior to valuing the Real Properties, the Debtor also did not consult any publicly available information, such as websites that provide recent sale or listing information for geographically similar apartments in New York City.

60.     Regarding his method of valuation, Himanshu testified as follows:

Q.     Is it fair to say you were just guessing as what the value was?

A.     I was not guessing. That was my hope to get the money for.

Q.     So it wasn't a guess, it was a hope?

A.     Yes.

61.     The Debtor's hope does not equate to an honest attempt to value their Real Properties for purposes of the PFS

a.     The Apartment.

62.     Upon information and belief, the Debtor purchased the Apartment in April 2004 for $1,220,000.

63.     In their Tennessee Bankruptcy Petition, the Debtor valued the Apartment at $1,220,000.

64.     In April 2014, the Debtor valued the Apartment in the PFS at $3,500,000.

65.     Upon information and belief, in or about July 2018, the Debtor listed the Apartment for sale for the sum of $2,850,000.

66.     In Schedule A/B, the Debtor valued the Property at $995,000.

67.     On July 9, 2020, the Debtor filed an amended Schedule A/B ("First Amendment"). (Dkt No. 8.)

68.     The First Amendment continued to value the Property at $995,000.

69.     On September 15, 2020, the Debtor moved to avoid EAS' Judgment lien, relying upon the $995,000 value of the Apartment set forth in Schedule A/B and the First Amendment. (Dkt. No. 21.)

70.     On November 19, 2020, in reply to the opposition filed by EAS to Debtor's motion to avoid EAS' Judgment lien, the Debtor submitted an appraisal valuing the Property at $1,200,000. (Dkt. No. 32.)

71.     On January 28, 2021, the Debtor amended their amended Schedule A/B ("Second Amendment"). (Dkt. No. 42.)

72.     The Apartment is omitted from the Second Amendment.

73.     On February 24, 2021, after being questioned at their Rule 2004 examinations regarding the omission of the Apartment from the Second Amendment, the Debtor filed another amended Schedule A/B ("Third Amendment"). (Dkt. No. 47.)

74.     The Third Amendment includes the Apartment and values the Apartment at $1,200,000.

75.     The Debtor grossly inflated the value of the Property in the PFS to provide EAS with a false sense of security regarding the Debtor's financial condition.

76.     At his Section 341(a) meeting of creditors ("341 Meeting"), the Debtor testified to the Chapter 7 Trustee that when the Debtor listed the Property in 2018 for the sum of $2,850,000, it was the "wrong price."

77.     During his 2004 examination, the Debtor elaborated on his prior testimony as follows: "That is right, it was wrong price. That's why they took it off, because it was very high and nobody -- he was just wasting his time."

78.     Having admitted that the market value of the Apartment was far less than

$2,850,000 in July 2018, the Debtor effectively conceded that the $3,500,000 market value set forth in the PFS was grossly overstated.

      b.    <u>The Tennessee Home</u>.

      79.    Upon information and belief, the Debtor purchased the Tennessee Home in 1995 for the sum of $33,500.

      80.    The Debtor valued the Tennessee Home in the Tennessee Bankruptcy Petition for the sum of $185,000.

      81.    The Debtor valued the Tennessee Home in the PFS at $389,000.

      82.    Upon information and belief, in June 2015, the Debtor closed on their sale of the Tennessee Home for the sum of $274,900, resulting in net sale proceeds in the sum of $76,395.

      83.    As testified to by Himanshu, the Debtor did not maintain or preserve any documents or records reflecting when or how they spent the $76,395 in net sale proceeds.

      84.    The Debtor grossly inflated the value of the Tennessee Home in the PFS.

      c.    <u>North Road Property</u>.

      85.    Upon information and belief, the Debtor purchased the North Road Property in December 2011 for the sum of $130,000.

      86.    Upon information and belief, shortly after purchasing the North Road Property, the Debtor retained J. Russo & Associates, LLC, to perform a survey of the North Road Property.

      87.    The survey shows that a portion of the North Road Property consists of wetlands.

      88.    In the Petition, the Debtor represents that 90% of the North Road Property

consists of wetlands.

89.     Himanshu testified that after purchasing the North Road, the Debtor listed the property for sale for the sum of $1,900,000.

90.     Himanshu testified that he learned that the North Road Property was "90% wetlands" when he listed the property for sale.

91.     When asked how he came up with the $1,900,000 value for the North Road Property for purposes of the sale listing, Himanshu testified that "Just, you know, whatever I think that let's see if I -- you know, everybody have their own dream, so we just throw the numbers."

92.     The Debtor valued the North Road Property in the PFS at $2,100,000.

93.     In the Petition, the Debtor values the North Road Property at $25,000.

94.     The Debtor grossly inflated the value of the North Road Property in the PFS.

d.     Strip Shopping Center.

95.     Upon information and belief, the Debtor purchased the Strip Shopping Center in January 2008 for the sum of $425,000.

96.     The Debtor valued the Strip Shopping Center in the PFS at $1,200,000.

97.     In March 2016, the Debtor sold the Strip Shopping Center for the sum of $675,000.

98.     Upon information and belief, the net proceeds from the sale of the Hotel were in the sum of $158,477.

99.     As testified to by Himanshu, the Debtor did not maintain or preserve any documents or records reflecting when or how they spent the $158,477 in net sale proceeds.

100. The Debtor grossly inflated the value of the Strip Shopping Center in the PFS.

e. The Hotel.

101. Upon information and belief, the Debtor purchased the Hotel in February 2013 for the sum of $350,000.

102. The Debtor valued the Hotel in the PFS at $2,100,000.

103. Upon information and belief, in March 2016, the Debtor sold the Hotel for the sum of $750,000.

104. Upon information and belief, the net proceeds from the sale of the Hotel were in the sum of $361,146.

105. As testified to by Himanshu, the Debtor did not maintain or preserve any documents or records reflecting when or how they spent the $361,146 in net sale proceeds.

106. The Debtor grossly inflated the value of the Hotel in the PFS.

vi. Tennessee Businesses.

107. In the PFS, the Debtor ascribes a "net market value" and "net worth" of $1,600,000 to the following three (3) business owned by Himanshu: (1) Mall Inc. - $700,000; (2) Mahi of TN LLC - $800,000; and (3) Mahi Vision - $100,000 (collectively "Tennessee Businesses").

108. Himanshu testified that prior to valuing the Tennessee Businesses in the PFS, he did not consult any professional with knowledge of the industry in which the Tennessee Businesses operated or review any business or financial records of any of the Tennessee Businesses.

a.    Mall, Inc.

109.    Upon information and belief, Mall Inc. operated a Subway franchise.

110.    When asked how the Debtor valued Mall Inc. at $700,000 for purposes of the PFS, Himanshu testified "Well, I thought, you know, I was making some money out of it, so I said that this is the value I want."

111.    Himanshu could not recall how much profit Mall Inc. allegedly generated.

112.    The Debtor did not retain any financial records, such as bank statements, financial statements, sales ledgers or tax returns, concerning Mall Inc.

113.    Upon information and belief, the Debtor inflated the value of Mall Inc. in the PFS.

b.    Mahi of TN.

114.    Upon information and belief, in or about 2004, Mahi of TN opened a Mexican restaurant known as the Cocina Mexican Grill.

115.    Himanshu testified that the value of $800,000 placed upon Mahi of TN in the PFS represented his "hope" as to the amount for which he could sell the restaurant.

116.    Himanshu testified that he closed the Cocina Mexican Grill in 2015 because after he and Manisha moved from Tennessee to New York to open the New York Subway, "people [at the Cocina Mexican Grill] were stealing a lot of money. We couldn't survive."

117.    The Debtor did not retain any financial records, such as bank statements, financial statements, sales ledgers or tax returns, concerning Mahi of TN.

118.    Upon information and belief, the Debtor inflated the value of Mahi of TN in the PFS.

c. <u>Mahi Vision.</u>

119. Upon information and belief, while still residing in Tennessee, Himanshu sought to franchise his Cocina Mexican Grill concept and formed Mahi Vision as the franchising entity.

120. Himanshu testified that Mahi Vision sold two (2) franchises, but that neither of the franchisees paid Mahi Vision a franchise fee.

121. Thus, Mahi Vision never earned any money.

122. Despite this, Himanshu valued Mahi Vision in the PFS at $100,000, a grossly inflated amount.

vii. <u>Tennessee Business Equity.</u>

123. Separate and apart from the Tennessee Businesses themselves, the PFS sets forth a value for "Business Equity/Investments TN" in the sum of $1,500,000.

124. Himanshu testified that the $1,500,000 represented the money invested in Mall Inc. and Mahi of TN, including for equipment and improvements, when the restaurants were opened.

125. The Debtor did not preserve or retain any records reflecting these supposed investments.

126. Regardless, upon information and belief, under generally accepted auditing standards, any investment by Himanshu in Mall Inc. and Mahi of TN should have been incorporated in the valuation of the businesses and not identified as a separate "equity" line item in the PFS.

127. Thus, the PFS grossly overstates the value of the Tennessee Businesses.

B.    The Petition.

128.    The Petition, Schedule A/B and the Statement of Financial Affairs ("SOFA") filed by the Debtor on June 8, 2020 contain numerous false and misleading statements.

129.    For example, the Petition, at Schedule A/B, falsely states that the current value of the Apartment is in the sum of $995,000.

130.    Upon information and belief, the Debtor intentionally undervalued the Apartment in the Petition to facilitate its improper attempt to avoid EAS' Judgment lien in its entirety.

131.    In response to Item 31 in Schedule A/B, the Debtor indicated that they had no interest in any life insurance policy.

132.    At his 2004 examination, Himanshu acknowledged that as of the Petition Date, he was the owner of a life insurance policy issued by New York Life Insurance Company and that Manisha was the beneficiary of said policy.

133.    In Schedule A/B, the Debtor represented that they owned the North Road Property and another property located in East Windsor, Connecticut known as Zero Prospect Hill Road ("Prospect Hill Road Property").

134.    On the Petition Date, the Debtor did not own the North Road Property or the Prospect Hill Road Property, as, upon information and belief, the Debtor had transferred these properties to Colorful Tree, LLC, a company wholly-owned by the Debtor, in 2018.

135.    In their SOFA, the Debtor represented that they had not transferred any property to anyone within two (2) years of the Petition Date.

136.    Contrary to this representation, upon information and belief, on or about July 6, 2018, the Debtor transferred the North Road Property and the Prospect Hill Road Property

- 16 -

to Colorful Tree for no consideration.

137.     Also contrary to this representation, upon information and belief, on or about August 1, 2019, Manisha transferred her interest in real property located at 354 Berlin Turnpike, Berlin, Connecticut ("Berlin Tpke. Property") to Krishnam LLC for no consideration.

138.     In their SOFA, the Debtor represented that they were not a party to any lawsuit or court action within one (1) year of the Petition Date.

139.     In fact, within one (1) year of the Petition Date, the Debtor were parties to two (2) lawsuits and court actions commenced by EAS, one venued in Supreme Court, New York County, based on the Debtor's breach of the Guaranty ("Guaranty Action"), and one venued in Superior Court, Hartford, Connecticut, based on the Debtor's fraudulent transfer of the North Road Property and the Prospect Hill Road Property to Colorful Tree LLC ("Colorful Tree") ("Fraudulent Conveyance Action").

140.     In their SOFA, the Debtor represented that they had not closed any financial accounts within one (1) year of the Petition Date.

141.     Upon information and belief, the Debtor closed one or more of their financial accounts at Chase Bank, Bank of America and TD Bank within one (1) year of the Petition Date.

142.     In the SOFA, the Debtor represented that within four (4) years of the Petition Date, the only business they owned was Metro 765.

143.     This representation was false, as the Debtor formed Colorful Tree in June 2018, while defending the Guaranty Action.

C.     The 341 Meeting.

144.     The Debtor's failure to honestly account for their assets, property and

financial affairs continued at their 341 Meeting.

145.    For example, Himanshu falsely testified that the Debtor never filed bankruptcy before when, in fact, the Debtor filed the Tennessee Bankruptcy in 2005.

146.    When asked if the Debtor transferred any property to anyone with the past four (4) years, Himanshu falsely answered "No, sir."

147.    When asked if they "made any money" when they sold their Tennessee Home in 2016,[3] Himanshu testified "We had some money, about $30,000."

148.    According to the HUD-1 Settlement Statement, the sale of the Tennessee Home generated $76,395 in net sale proceeds.

149.    When asked whether the Debtor ever owned any property in Nashville, Tennessee, Himanshu testified regarding the Tennessee Home, but omitted any testimony regarding the Hotel or the Strip Shopping Center.

150.    According to the HUD-1 Settlement Statements, the sale of the Hotel in May 2015 generated $361,146 in net sale proceeds and the sale of the Strip Shopping Center in March 2016 generated $158,477 in net sale proceeds.

151.    As noted above, the Debtor did not preserve or maintain any records reflecting how these sales proceeds were spent.

152.    Himanshu also failed to provide testimony regarding two (2) other real properties previously owned by the Debtor in Nashville, Tennessee, one located at 1572/1576 Bell Road ("Bell Road Property") and the other located at 2040 Metro Center Boulevard ("Metro Center Property").

---

[3] Based on public records, the Debtor sold the Tennessee Home in 2015, but Himanshu testified that the sale occurred in 2016.

C.    The 2004 Examination.

153.    The Debtor's failure to honestly account for their assets, property and financial affairs continued at their 2004 Examination.

154.    When questioned regarding the source of the $850,000 in funds allegedly spent by the Debtor in connection with the construction and improvement of the New York Subway in late 2014, Himanshu testified that one funding source was proceeds from the sale of the Bell Road and Metro Center properties.

155.    Documents filed in the Tennessee Bankruptcy Case establish that the entirety of the net proceeds from the sale of the Bell Road and Metro Center properties were paid to the Debtor's creditors pursuant to the Debtor's plan of reorganization.

156.    Thus, contrary to Himanshu's testimony, the sale proceeds could not have been used to finance the construction of the New York Subway.

157.    Himanshu testified that the other funding source was profits from the operation of the Debtor's Tennessee Businesses.

158.    The truthfulness of this testimony cannot be verified because the Debtor did not preserve or maintain any records from any of its Tennessee Businesses.

159.    At his 2004 examination, Himanshu denied that he ever sought to develop the North Road Property.

160.    Upon information and belief, on October 22, 2019, Himanshu appeared at a meeting of the Town of East Windsor Planning and Zoning Commission.

161.    Under the subheading "New Business," the minutes of the meeting state: "A. Informal discussion with Mr. Himanshu Patel re: residential development."

162.    According to the meeting minutes, Himanshu "met with Town Planner

Flores-Marzan, Assistant Town Planner Mosso, and First Selectman Maynard to discuss development options [at the North Road Property]. He [Himanhsu] is presently considering construction of 260 luxury apartments."

163. According to the meeting minutes, Himanshu spoke at length regarding the planned construction and answered questions regarding the location of the wetlands on the North Road Property and his concept to "develop multi-family residential units."

164. Based on the meeting minutes, Himanshu's testimony that he never sought to develop the North Road Property was false.

165. Upon information and belief, in the six (6) years preceding the Petition Date, the Debtor's primary source of income related to their operation of the New York Subway through Metro 765.

166. The Debtor's testimony at their 2004 examination underscored how Debtor's failure to preserve and maintain the most basic financial records has made it impossible to reconstruct the Debtor's finances during the six (6) years preceding the Petition Date.

167. For example, Metro 765's income tax returns reflect that in 2014, the Debtor loaned the sum of $475,810 to Metro 765 and that as of year end 2016, the loan had been repaid in full.

168. Given the Debtor's failure to preserve or maintain any records regarding the loans and/or the repayment of the loans, EAS cannot determine the source of the loans or the manner in which the Debtor spent the $475,810 in loan repayments.

169. Himanshu testified that in the years preceding the Petition Date, the Debtor borrowed an undefined amount from "friends and family" and repaid the loans, but that the Debtor has no records documenting the loans or repayments.

170. Metro 765's income tax returns further reflect that based on income and expenses, Metro had cash available at year-end 2014, 2015 and 2016.

171. Due to Debtor's failure to engage in any semblance of routine financial record-keeping, EAS has no means to determine whether any cash from Metro 765's operations was deposited into the Debtor's personal bank accounts and, if so, how the Debtor spent the money.

172. In sum, the Debtor's testimony confirmed that Debtor concealed, destroyed, mutilated, falsified or failed to keep or preserve recorded information, including books, records, documents and papers, from which the Debtor's financial condition or business transactions might be ascertained.

173. The Debtor's testimony confirmed that Debtor, in connection with the bankruptcy case, made a false oath or account with respect to their assets, property, and financial affairs and presented or used a false claim.

174. Debtor failed to satisfactorily explain a loss of assets and deficiency of assets to meet their liabilities

175. For the foregoing reasons, EAS seeks a judgment declaring their claims against the Debtor nondischargeable pursuant to Section 523 of the Bankruptcy Code and object to the general discharge of Debtor's debt pursuant to Section 727 of the Bankruptcy Code.

## AS AND FOR A FIRST CLAIM FOR RELIEF
## NON-DISCHARGEABILITY UNDER 11 U.S.C. § 523(a)(2)(B)

176. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "175" of this Complaint as if more fully set forth at length herein.

177. The Debtor's debt to EAS is based on the Debtor's breach of the Lease Guaranty and was obtained by the use of the PFS, which is a statement in writing: (i) that is

- 21 -

materially false; (ii) respecting the Debtor's financial condition; (iii) on which EAS reasonably relied in entering into the Lease and accepting the Guaranty; and (iv) that the Debtor caused to be made and published to EAS with intent to deceive.

178. By virtue of the foregoing, the Debtor's debt to EAS should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).

## AS AND FOR A SECOND CLAIM FOR RELIEF
## DISCHARGE SHOULD BE DENIED UNDER 11 U.S.C. § 727(a)(2)

179. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "178" of this Complaint as if more fully set forth at length herein.

180. With intent to hinder, delay or defraud EAS, Manisha transferred her interest in the Berlin Tnpke. Property to Krishnam LLC within one year before the Petition Date.

181. By virtue of the foregoing, Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2).

## AS AND FOR A SECOND CLAIM FOR RELIEF
## DISCHARGE SHOULD BE DENIED UNDER 11 U.S.C. § 727(a)(3)

182. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "181" of this Complaint as if more fully set forth at length herein.

183. The Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records and paper, from which the Debtor's financial condition or business transactions from April 2014 through the Petition Date might be ascertained.

184. By virtue of the foregoing, Debtor's discharge should be denied under 11 U.S.C. § 727(a)(3).

## AS AND FOR A SECOND CLAIM FOR RELIEF
## DISCHARGE SHOULD BE DENIED UNDER 11 U.S.C. § 727(a)(4)

185.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "184" of this Complaint as if more fully set forth at length herein.

186.    Debtor's Petition, Schedule A/B and SOFA contain numerous material misrepresentations and falsehoods, only certain of which were cured in the First Amendment, Second Amendment and Third Amendment.

187.    The Debtor provided false and misleading testimony at the 341 Meeting and Rule 2004 Examination regarding their income, expenses, assets and liabilities.

188.    Upon information and belief, the Debtor's material misrepresentations, falsehoods and false and misleading testimony were made knowingly and fraudulently.

189.    By virtue of the foregoing, Debtor's discharge should be denied under 11 U.S.C. § 727(a)(4).

## AS AND FOR A SECOND CLAIM FOR RELIEF
## DISCHARGE SHOULD BE DENIED UNDER 11 U.S.C. § 727(a)(5)

190.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "189" of this Complaint as if more fully set forth at length herein.

191.    The Debtor has failed to explain satisfactorily the loss of assets reflected in the PFS, including $828,000 in bank account balances.

192.    The Debtor's sale of the Tennessee Home in 2015, the Hotel in 2015 and the Shopping Center in 2016 yielded net proceeds in the aggregate sum of $596,018.

193.    The Debtor has failed to explain satisfactorily the loss of these assets.

194.    In 2015 and 2016, Metro 765 repaid $475,810 in shareholder loans to the Debtor.

195.    The Debtor has failed to explain satisfactorily the loss of these assets.

196.    By virtue of the foregoing, Debtor's discharge should be denied under 11 U.S.C. § 727(a)(5).

WHEREFORE, Plaintiff Eighth Avenue Sky, LLC respectfully request that the Court enter a judgment: (i) determining that any debt owed to Plaintiffs by Defendant is non-dischargeable under Section 523(a) of the Bankruptcy Code; (ii) determining that Defendant's debt is non-dischargeable in its entirety under Section 727 of the Bankruptcy Code; and (iii) granting Plaintiff's attorneys' fees and costs; and (iv) granting such other and further relief as may be just and proper.

Dated: Garden City, New York
       March 5, 2021

Weinberg, Gross & Pergament LLP
Attorneys for Eighth Avenue Sky, LLC

By:    /s/ Marc J. Weingard
       Marc J. Weingard
       400 Garden City Plaza, Suite 403
       Garden City, New York 11530
       (516) 877-2424
       mweingard@wgplaw.com